**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| TYLER FOLKNER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ASSURANCEAMERICA MANAGING GENERAL AGENCY, LLC d/b/a ASSURANCEAMERICA,<br><br>Defendant. | Case No.:<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff TYLER FOLKNER, individually and on behalf of all others similarly situated ("Plaintiff"), brings this action against Defendant AssuranceAmerica Managing General Agency, LLC d/b/a AssuranceAmerica ("AssuranceAmerica" or "Defendant"),[1] seeking monetary damages, restitution, and/or injunctive relief for the proposed Class and Subclasses, as defined below. Plaintiff makes the following

[1] Trustway Insurance, *Company List*, https://direct.assuranceamerica.com/faq/companylist.html (last visited Jul. 16, 2026).

allegations upon information and belief, the investigation of counsel, and personal knowledge or facts that are a matter of public record.

## I. INTRODUCTION

1. The release, disclosure, and publication of sensitive, private data can be devasting. Not only is it an intrusion of privacy and a loss of control, but it is a harbinger of identity theft: for victims of a data breach, the risk of identity theft more than quadruples.[2] A data breach can have a grave consequences for victims for years after the actual date of the breach—with the obtained information, thieves can wreak many forms of havoc: open new financial accounts, take out loans, obtain medical services, obtain government benefits, and/or obtain driver's licenses in the victims' names, forcing victims to maintain a constant vigilance over the potential misuse of their information.

2. Atlanta, Georgia headquartered AssuranceAmerica provides automobile and renter's insurance in thirteen states, including Indiana, Plaintiff's state of residence.[3] It markets itself as an "enterprise in the insurance and financial

[2] Dave Maxfield & Bill Latham, *Data Breaches: Perspectives from Both Sides of the Wall*, S.C. Lawyer (May 2014).

[3] AssuranceAmerica, *Get Started,* https://www.assuranceamerica.com (last visited on Jul., 23, 2026).

services industry," stating that "we have the freedom to grow in ways that prioritize people, enhance community, and focus on long-term impact."[4]

3. However, on or about March 17, 2026, AssuranceAmerica discovered suspicious activity on its network caused by "malicious activity… that targeted one of the Company's employees."[5]

4. On or about July 10, 2026, AssuranceAmerica admitted that it experienced a data breach on a disclosure on its website (the "Data Breach").[6] The disclosure does not state the number of people affected but provides that "the personal information contained in the affected files varies by individual and includes one or more of the following types of personal information: name, contact information, automobile insurance policy or insurance account information, driver or vehicle information, claims-related information, driver's license number, and, for a limited number of individuals, Tax ID information or Social Security number."[7]

---

[4] AssuranceAmerica Group, *About Us,* https://www.assuranceamerica.com/group-about-us# (last visited on Jul. 16, 2026).

[5] Kurt Knutsson, https://www.foxnews.com/tech/insurance-breach-exposes-7m-drivers-licenses, *Insurance breach exposes 7m driver's licenses*, Fox News, (last visited Jul. 23, 2026); AssuranceAmerica, *Notice of Data Breach*, https://www.assuranceamerica.com/Notice (last visited Jul. 23, 2026).

[6] AssuranceAmerica, *Notice of Data Breach,* https://www.assuranceamerica.com/Notice (last visited Jul. 23, 2026).

[7] *Id.*

5. What is extraordinarily troubling about the Data breach is that even though it knew how valuable customer information is, AssuranceAmerica failed to adequately protect Plaintiff's and Class Members' Personal Identifiable Information ("PII"). This PII was compromised due to Defendant's negligent and/or careless acts and omissions and its utter failure to protect customers' sensitive data. Hackers targeted and obtained Plaintiff's and Class Members' PII because of its value in exploiting and stealing the identities of Plaintiff and Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

6. Defendant AssuranceAmerica is a privately held Company that generates tens of millions of dollars each year. AssuranceAmerica's total annual revenue is estimated at $99 million.[8] AssuranceAmerica easily could have allocated a small portion of its burgeoning revenues toward cybersecurity and prevention to forestall and prevent the Data breach. But Defendant chose profits over protection of customer's most sensitive PII. As a result of the Data Breach, though which their PII was compromised, disclosed, and obtained by unauthorized third parties, Plaintiff and Class members have suffered concrete damages and are now exposed to a heightened and imminent risk of fraud and identity theft for a period of years, if

[8] Growjo, *AssuranceAmerica Corporation Revenue and Competitors*, https://growjo.com/company/AssuranceAmerica_Corporation? (last visited Jul. 23, 2026).

not decades. Furthermore, Plaintiff and Class members must now and in the future closely monitor their financial accounts to guard against identity theft at their own expense. Moreover, they must make family and close friends aware that personal information about class members could be used in fraud and phishing attempts targeting their friends and families. Consequently, Plaintiff and the other Class members will incur ongoing out-of-pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft and other fraudulent behavior.

7. As a result of the Data Breach, through which their PII was compromised, disclosed, and obtained by unauthorized third parties, Plaintiff and Class Members have suffered concrete damages and are now exposed to a heightened and imminent risk of fraud and identity theft for a period of years, if not decades. Furthermore, Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft at their own expense. Consequently, Plaintiff and the other Class Members will incur ongoing out-of-pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

8. By this Complaint, Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose Private Information was accessed during the Data Breach.

## II. PARTIES

**A. Plaintiff Tyler Folkner**

9. Plaintiff Folkner is a resident of Muncie, Indiana who obtained automobile insurance from AssuranceAmerica. He has paid Defendant for insurance products and services through AssuranceAmerica since about 2023.

10. As a prerequisite to receive insurance products and services, AssuranceAmerica required that Plaintiff Folkner disclose his Private Information which it then retained.

11. Thus, Plaintiff Folkner disclosed his Private Information to AssuranceAmerica including his name, contact information, automobile insurance policy and insurance account information, driver and vehicle information, claims related information, driver's license number and information, Tax ID information, and Social Security number.

12. Plaintiff Folkner is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner. Indeed, he takes many steps to secure his Private Information including, *inter alia*: keeping documents with his private information in a secure location; shredding or otherwise destroying documents with his private information when no longer needed; using strong passwords for his online accounts; and checking his credit reports.

13. Plaintiff Folkner provided his Private Information to Defendant and trusted it would use reasonable measures to protect it according to their internal policies, as well as state and federal law. Defendant obtained and continues to maintain his Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

14. Plaintiff Folkner reasonably understood that a portion of the funds paid to AssuranceAmerica would be used to pay for adequate cybersecurity and protection of Private Information.

15. Plaintiff Folkner received a Data Breach notice from Defendant dated July 10, 2026. The notice confirmed that Private Information regarding Plaintiff Folkner was compromised including his "name, contact information, automobile insurance policy or insurance account information, driver or vehicle information, claims related information, driver's license number/information, Tax ID information and/or Social Security number."[9]

16. As a result, Plaintiff Folkner was injured by Defendant and its Data Breach.

17. On information and belief, Plaintiff Folkner's Private Information has already been published—or will be published imminently—on the Dark Web by the cybercriminals involved in the Data Breach.

[9] Exhibit A, Data Breach Notice Letter (Jul. 10, 2026).

18. In fact, Plaintiff Folkner has already experienced several instances of fraudulent activity using his personal information since the Data Breach. For instance, he has received several emails regarding loan application submissions that he did not complete and has had to change the status of his credit profile to be on alert for fraudulent activity in response to this security threat.

19. To mitigate the financial risk resulting from the Data Breach, Plaintiff withdraws his direct deposit payments from his employer as soon as he is paid to minimize the time that his money is in his bank account, which was compromised in Defendant's Data Breach. He is now considering switching his accounts to a new bank to further distance his finances from the banking information that was compromised in the Data Breach. This frustrates Plaintiff because he trusts his current bank and would not want to switch banks if not for the Data Breach.

20. Moreover, Plaintiff also suffered financial consequences due to compromised accounts disclosed in the Data breach. Plaintiff's debit card was hacked by a fraudulent actor who stole approximately $1.99 from his bank account on or about April 2026. As a result, Plaintiff had to cancel his debit card and request a new card that same day to prevent further fraudulent activity.

21. During the ten-day waiting period for the new card to arrive in the mail, Plaintiff was unable to purchase gas for transportation to and from work. He also received a $20 late fee on his phone bill, which was due during the ten-day period

Plaintiff did not have access to his funds. Plaintiff has not been compensated for this charge resulting from Defendant's Data Breach.

22. Plaintiff Folkner has also suffered a significant increase in spam calls. His spam call frequency increased from approximately five calls per week to approximately twenty-five (25) calls per week. One of these spam callers even read Plaintiff's entire Social Security number to him during the call, confirming that Plaintiff's Social Security number is, and will forever be, compromised. Plaintiff also misses important calls and messages because he is fearful of picking up his phone due to the constant spam. This greatly affects his ability to communicate with friends and family.

23. Plaintiff Folkner has spent—and will continue to spend—significant time and effort attempting to mitigate the risks of identity theft and fraud created by the Data Breach.

24. Thus far, Plaintiff Folkner has spent approximately thirty (30) hours attempting to mitigate the risks created by the Data Breach. This includes monitoring his accounts for suspicious activity; researching the Data Breach; contacting his bank; contacting credit bureaus; and changing his passwords.

25. Plaintiff Folkner has suffered substantial emotional distress because his Private Information was exposed to cybercriminals during the Data Breach. Plaintiff Folkner is now terrified of cybercriminals using the Private Information obtained

during the Data Breach to steal his identity and commit fraud, and has experienced a significant increase in anxiety and fear as a result of the Data Breach. He uses work as a distraction from the stress of the risk following the Breach. Specifically, Plaintiff Folkner is fearful of the cybercriminals who now have access to his PII because "they could take over my entire life with numbers and passwords, could even get a loan, car, house, or take my house… it's a lot to think about and it drives me nuts." He is also in the process of changing his automobile insurance provider because he no longer trusts AssuranceAmerica's ability to protect his best interests in light of the Data Breach.

26. Plaintiff Folkner suffered an actionable invasion of privacy when his Private Information was exposed to nefarious cybercriminals during the Data breach.

27. Plaintiff Folkner suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property which AssuranceAmerica was required to adequately protect.

28. As a policyholder, Plaintiff Folkner suffered actual injury and lost the "benefit of the bargain" because Plaintiff Folkner paid Defendant for insurance and reasonable data security—but Defendant then cut corners and declined to provide the bargained for data security. After all, if Defendant was transparent about its deficient data security, then Plaintiff Folkner (1) would have either declined to

become a customer of Defendant and would have taken his business to a competitor, or (2) would have become a customer of Defendant only if Defendant reduced its prices to account for the deficient data security.

29. Plaintiff Folkner suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because the Data Breach placed his Private Information right in the hands of criminals.

30. Today, Plaintiff Folkner has a continuing interest in ensuring that his Private Information—which, on information and belief, is still maintained and inadequately secured by Defendant—is protected and safeguarded from additional breaches. Plaintiff Folkner represents similarly situated Class Members.

**B. Defendant**

31. Defendant AssuranceAmerica Managing General Agency, LLC d/b/a AssuranceAmerica is incorporated in Georgia with its principal place of business at 100 Galleria Parkway, Suite 800, Atlanta, GA 30339.[10]

32. In the course of its business, AssuranceAmerica collects "name, mailing address, email address, telephone number, date of birth, driver's license number, IP address, device identifiers… insurance application and underwriting

[10] Georgia Corporations Division, *AssuranceAmerica Insurance Company*, https://ecorp.sos.ga.gov/BusinessSearch/BusinessInformation?businessId=189612&businessType=Foreign%20Profit%20Corporation&fromSearch=True (last visited Jul. 24, 2026).

information such as driver history, vehicle information, claims history, policy information, insurance history, coverage selections," and "financial information such as billing records, payment information, bank account information, and transaction history.[11]

## III. JURISDICTION AND VENUE

33. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1711, et seq., because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

34. The Court has jurisdiction over Defendant AssuranceAmerica Managing General Agency, LLC because it maintains its principal place of business in this District, has sufficient minimum contacts with this District, and has purposefully availed itself of the privilege of doing business in this District such that it could reasonably foresee litigation being brought in this District.

---

[11] AssuranceAmerica, *Privacy Policy,* https://www.assuranceamerica.com/Privacy (last visited Jul. 23, 2026).

35. Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because AssuranceAmerica's principal place of business is located in this District and a substantial part of the events or omissions giving rise to the claims occurred in, was directed to, and/or emanated from this District.

## IV. FACTUAL BACKGROUND

### A. AssuranceAmerica Failed to Adequately Protect Customer Data, Resulting in the Data Breach.

36. On its Privacy Policy Page, AssuranceAmerica claims that "We maintain administrative, technical, and physical safeguards designed to protect personal information from unauthorized access, disclosure, alteration, or misuse."[12] Notwithstanding these promises, AssuranceAmerica experienced a Data Breach that affected an at least approximately seven million policyholders.[13]

37. AssuranceAmerica claims to have discovered the Data Breach on March 17, 2026.[14]

---

[12] *Id.*

[13] CyberNews, *6.9 million US driver's license records exposed in latest insurance breach,* https://cybernews.com/news/assuranceamerica-insurance-breach-7-million-drivers-license-records/ (last visited Jul. 23, 2026).

[14] AssuranceAmerica, *Notice of Data Breach,* https://www.assuranceamerica.com/Notice (last visited Jul. 23, 2026).

38. On July 10, 2026, AssuranceAmerica admitted its systems had been breached by malicious activity targeting an AssuranceAmerica employee through a Notice published on its website[15] and sent to Data Breach victims via physical mail.[16]

39. AssuranceAmerica was familiar with its obligations—created by contract, industry standards, common law, and representations to its customers—to protect customer information. Plaintiff and Class Members provided their Private Information to AssuranceAmerica with the reasonable expectation that AssuranceAmerica would comply with its obligations to keep such information confidential and secure.

40. AssuranceAmerica failed to comply with these obligations, resulting in the Data Breach. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records.

**B. Defendant was well aware of the need to take special care with consumers' PII.**

41. Defendant made representations in its Privacy Policy concerning securing consumers PII because it knew and understood the severe consequences of losing this data.[17]

---

[15] *Id*.

[16] Exhibit A, Data Breach Notice Letter (Jul. 10, 2026).

[17] AssuranceAmerica, *PrivacyPolicy,* https://www.assuranceamerica.com/Privacy (last visited Jul. 23, 2026).

42. PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers can easily sell stolen data since "personal information can sell for upwards of hundreds or even thousands of dollars on the dark web… From Social Security numbers to bank logins… cybercriminals buy and sell stolen data every day."[18]

**C. Defendant Failed to Comply With Regulatory Guidance and Industry-Standard Cybersecurity Practices.**

43. Defendant's data security failure stems from its failure to comply with state and federal laws and requirements as well as industry standards governing the protection of PII.

44. At least 24 states have enacted laws addressing data security practices that require that businesses that own, license or maintain PII to implement and maintain "reasonable security procedures and practices" and to protect PII from unauthorized access.

45. Defendant also failed to comply with Federal Trade Commission ("FTC") guidance on protecting PII and industry-standard cybersecurity practices. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, failing to use reasonable

[18] Ben Luthi, *Here's What Your Data Sells for on the Dark Web*, Experian, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Jul. 23, 2026).

measures to protect PII by companies like Defendant. Several publications by the FTC outline the importance of implementing reasonable security systems to protect data. The FTC has made clear that protecting sensitive customer data should factor into virtually all business decisions.

46. The FTC recommends:

- limiting access to customer information to employees who have a business reason to see it;
- keeping customer information in encrypted files provides better protection in case of theft;
- maintaining up-to-date and appropriate programs and controls to prevent unauthorized access to customer information;
- using appropriate oversight or audit procedures to detect the improper disclosure or theft of customer information;
- monitoring both in- and out-bound transfers of information for indications of a compromise, such as unexpectedly large amounts of data being transmitted from your system to an unknown user; and,
- monitoring activity logs for signs of unauthorized access to customer information.[19]

---

[19] Federal Trade Commission, *Financial Institutions and Customer Information: Complying with the Safeguards Rule*, available at https://www.ftc.gov/tips-

47. The FTC has also issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[20]

48. In 2016, the FTC updated its publication, Protecting PII: A Guide for Business, which established guidelines for fundamental data security principles and practices for business.[21] The guidelines note businesses should protect the personal customer information that they keep; properly dispose of PII that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

---

advice/business-center/guidance/financial-institutions-customer-information-complying (last visited June 13, 2024).

[20] Federal Trade Commission, *Start With Security* at 2, available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Jan. 6, 2025).

[21] Federal Trade Commission, *Protecting PII: A Guide for Business*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_protecting-personal-information.pdf (last visited June 13, 2024).

49. The FTC recommends that businesses delete payment card information after the time needed to process a transaction; restrict employee access to sensitive customer information; require strong passwords be used by employees with access to sensitive customer information; apply security measures that have proven successful in the particular industry; and verify that third parties with access to sensitive information use reasonable security measures.

50. The FTC also recommends that companies use an intrusion detection system to immediately expose a data breach; monitor incoming traffic for suspicious activity that indicates a hacker is trying to penetrate the system; monitor for the transmission of large amounts of data from the system; and develop a plan to respond effectively to a data breach in the event one occurs.

51. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

52. The FTC has interpreted Section 5 of the FTC Act to encompass failures to appropriately store and maintain personal data.

53. According to the Federal Bureau of Investigation (FBI), phishing schemes designed to induce individuals to reveal personal information, such as network passwords, were the most common type of cybercrime in 2020, with such incidents nearly doubling in frequency between 2019 and 2020.[22] According to Verizon's 2021 Data Breach Investigations Report, 43% of breaches stemmed from phishing and/or pretexting schemes.[23]

54. On October 28, 2020, the FBI and two federal agencies issued a "Joint Cybersecurity Advisory" warning that they have "credible information of an increased and imminent cybercrime threat to U.S. hospitals and healthcare providers."[24] The Cybersecurity and Infrastructure Security Agency (CISA), the Department of Health and Human Services (HHS), and the FBI issued the advisory

[22] *2020 Internet Crime Report*, FBI, https://www.ic3.gov/Media/PDF/AnnualReport/2020_IC3Report.pdf (last visited Jan. 6, 2025).

[23] *2021 DBIR Master's Guide*, Verizon, https://www.verizon.com/business/resources/reports/dbir/2021/masters-guide/ (subscription required) (last visited June 13, 2024).

[24] *Ransomware Activity Targeting the Healthcare and Public Health Sector*, Joint Cybersecurity Advisory, https://us-cert.cisa.gov/sites/default/files/publications/AA20-302A_Ransomware%20_Activity_Targeting_the_Healthcare_and_Public_Health_Sector.pdf (last visited Jan. 7, 2025).

to warn healthcare providers to take "timely and reasonable precautions to protect their networks from these threats."[25]

55. Defendant was aware of its obligations to protect customers' PII and privacy before and during the Data Breach, yet failed to take reasonable steps to protect customers from unauthorized access. In this case, Defendant was at all times fully aware of obligation to protect the PII of Defendant's customers because of its status one of the largest providers of supplemental health insurance in the United States. Defendant was also aware of the significant repercussions if it failed to do so because Defendant collected PII from millions of consumers and knew that this PII, if hacked, would result in injury to consumers, including Plaintiff and Class Members.

56. Based upon the known details of the Data Breach and how it occurred, Defendant also failed to fully comply with industry-standard cybersecurity practices, including, but not limited to, proper firewall configuration, network segmentation, secure credential storage, rate limiting, user-activity monitoring, data-loss prevention, and intrusion detection and prevention.

[25] *Id.*

**D. The Data Breach Puts Consumers at Increased Risk of Fraud and Identity Theft.**

57. An identity thief uses victims' PII, such as name, address, and other sensitive and confidential information, without permission, to commit fraud or other crimes that range from immigration fraud, obtaining a driver's license or identification card, obtaining government benefits, and filing fraudulent tax returns to obtain tax refunds.

58. Identity thieves can use a victim's PII to open new financial accounts, incur charges in the victim's name, take out loans in the victim's name, and incur charges on existing accounts of the victim. Plaintiff's finances are now at risk due to the Data Breach.

59. Identity theft is the most common consequence of a data breach—it occurs to 65% of data breach victims.[26] Consumers lost more than $56 billion to identity theft and fraud in 2020, and over 75% of identity theft victims reported emotional distress.[27]

60. Plaintiff and members of the Class are now in the position of having to take steps to mitigate the damages caused by the Data Breach. Once use of

---

[26] Eugene Bekker, *What Are Your Odds of Getting Your Identity Stolen?*, IDENTITYFORCE (Apr. 15, 2021), https://www.identityforce.com/blog/identity-theft-odds-identity-theft-statistics (last visited Feb. 1, 2023).

[27] *Id.*

compromised non-financial PII is detected, the emotional and economic consequences to the victims are significant. Studies done by the ID Theft Resource Center, a non-profit organization, found that victims of identity theft had marked increased fear for personal financial security. The report attributes this to more people having been victims before, contributing to greater awareness and understanding that they may suffer long term consequences from this type of crime.[28]

61. AssuranceAmerica failed to protect and safeguard Plaintiff's and Class Members' private information, in fact failing to adhere to even its most basic obligations. As a result, Plaintiff and Class Members have suffered or will suffer actual injury, including loss of privacy, costs, and loss of time.

## V. CLASS ACTION ALLEGATIONS

62. Plaintiff brings this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of a proposed nationwide class (the "Class"), defined as:

> All natural persons in the United States whose Personally Identifiable Information and/or Personal Health Information was compromised as a result of the Data Breach.

[28] Identity Theft: The Aftermath 2013, Identity Theft Resource Center, https://idtheftinfo.org/latest-news/72 (last visited Feb. 1, 2023).

63. **Numerosity and Ascertainability:** Plaintiff does not know the exact size of the Class or identity of the Class Members, since such information is in the exclusive control of Defendant. Nevertheless, the Class encompasses at least millions of individuals dispersed throughout the United States. The number of Class Members is so numerous that joinder of all Class Members is impracticable. The names, addresses, and phone numbers of Class Members are identifiable through documents maintained by Defendant.

64. **Commonality and Predominance:** This action involves common questions of law and fact which predominate over any question solely affecting individual Class Members. These common questions include:

a. whether Defendant engaged in the conduct alleged herein;

b. whether Defendant had a legal duty to use reasonable security measures to protect Plaintiff's and Class Members' PII;

c. whether Defendant timely, accurately, and adequately informed Plaintiff and Class Members that their PII had been compromised;

d. whether Defendant breached its legal duty by failing to protect the PII of Plaintiff and Class Members;

e. whether Defendant acted reasonably in securing the PII of Plaintiff and Class Members;

f. whether Plaintiff and Class Members are entitled to injunctive relief; and

g. whether Plaintiff and Class Members are entitled to damages and equitable relief.

65. **Typicality:** Plaintiff's claims are typical of the other Class Members' claims because all Class Members were comparably injured through Defendant's substantially uniform misconduct, as described above. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other members of the Class that he represents, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and Class Members arise from the same operative facts and are based on the same legal theories.

66. **Adequacy:** Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other members of the Class he seeks to represent; Plaintiff has retained counsel competent and experienced in complex

class action litigation; and Plaintiff intends to prosecute this action vigorously. The Class's interest will be fairly and adequately protected by Plaintiff and his counsel.

67. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other detriment suffered by Plaintiff and other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be virtually impossible for the Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not: individualized litigation creates a potential for inconsistent or contradictory judgments, increases the delay and expense to the parties, and increases the expense and burden to the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by this Court.

## VI. CAUSES OF ACTION

### A. Claims Brought on Behalf of the Class

**COUNT ONE**
**NEGLIGENCE**
**(on Behalf of Plaintiff and the Class)**

68. Plaintiff incorporates the allegations set forth in Paragraphs 1-67 as if fully set forth herein.

69. AssuranceAmerica owed a duty to Plaintiff and Class Members, arising from the sensitivity of the information, the expectation the information was going to be kept private, and the foreseeability of its data safety shortcomings resulting in an intrusion, to exercise reasonable care in safeguarding their sensitive personal information. This duty included, among other things, designing, implementing, maintaining, monitoring, and testing AssuranceAmerica's networks, systems, protocols, policies, procedures and practices to ensure that Plaintiff's and Class Members' information was adequately secured from unauthorized access.

70. AssuranceAmerica's Privacy Policy acknowledged AssuranceAmerica's duty to adequately protect Plaintiff's and Class Members' PII.[29]

[29] AssuranceAmerica, *Privacy Policy,* https://www.assuranceamerica.com/Privacy (last visited Jul. 23, 2026).

71. AssuranceAmerica owed a duty to Plaintiff and Class Members to implement administrative, physical and technical safeguards, such as intrusion detection processes that detect data breaches in a timely manner, to protect and secure Plaintiff's and Class Members' PII.

72. AssuranceAmerica also had a duty to only maintain PII that was needed to serve customer needs.

73. AssuranceAmerica owed a duty to disclose the material fact that its data security practices were inadequate to safeguard Plaintiff's and Class Members' PII.

74. AssuranceAmerica also had independent duties under Plaintiff's and Class Members' state laws that required AssuranceAmerica to reasonably safeguard Plaintiff's and Class Members' PII, and promptly notify them about the Data Breach.

75. AssuranceAmerica had a special relationship with Plaintiff and Class Members as a result of being entrusted with their PII, which provided an independent duty of care. Plaintiff's and Class Members' willingness to entrust AssuranceAmerica with their PII was predicated on the understanding that AssuranceAmerica would take adequate security precautions. Moreover, AssuranceAmerica was capable of protecting its networks and systems, and the PII it stored on them, from unauthorized access.

76. AssuranceAmerica breached its duties by, among other things: (a) failing to implement and maintain adequate data security practices to safeguard

Plaintiff's and Class Members' PII, including administrative, physical, and technical safeguards; (b) failing to detect the Data Breach in a timely manner; and (c) failing to disclose that its data security practices were inadequate to safeguard Plaintiff's and Class Members' PII.

77. But for AssuranceAmerica's breach of its duties, including its duty to use reasonable care to protect and secure Plaintiff's and Class Members' PII, Plaintiff's and Class Members' PII would not have been accessed by unauthorized parties.

78. Plaintiff and Class Members were foreseeable victims of AssuranceAmerica's inadequate data security practices. AssuranceAmerica knew or should have known that a breach of its data security systems would cause damage to Plaintiff and Class Members.

79. It was reasonably foreseeable that the failure to reasonably protect and secure Plaintiff's and Class Members' PII would result in unauthorized access to AssuranceAmerica's networks, databases, and computers that stored or contained Plaintiff's and Class Members' PII.

80. As a result of AssuranceAmerica's negligent failure to prevent the Data Breach, Plaintiff and Class Members suffered injury, which includes, but is not limited to, exposure to a heightened and imminent risk of fraud, identity theft, and financial harm. Plaintiff and Class Members must monitor their financial accounts

and credit histories more closely and frequently to guard against identity theft. Plaintiff and Class Members have also incurred, and will continue to incur on an indefinite basis, out-of-pocket costs for obtaining credit reports, credit freezes, credit monitoring services, and other protective measures to deter and detect identity theft. The unauthorized acquisition of Plaintiff's and Class Members' PII has also diminished the value of the PII.

81. The harm to Plaintiff and Class Members was a proximate, reasonably foreseeable result of AssuranceAmerica's breaches of its aforementioned duties.

82. Therefore, Plaintiff and Class Members are entitled to damages in an amount to be proven at trial.

## COUNT TWO
## NEGLIGENCE PER SE
## (on Behalf of Plaintiff and the Class)

83. Plaintiff incorporates the allegations set forth in Paragraphs 1-67 as if fully set forth herein.

84. Under the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, AssuranceAmerica had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

85. In addition, under state data security statutes, AssuranceAmerica had a duty to implement and maintain reasonable security procedures and practices to safeguard Plaintiff's and Class Members' PII.

86. AssuranceAmerica breached its duties to Plaintiff and Class Members, under the Federal Trade Commission Act, 15 U.S.C. § 45, ("FTCA") and the state data security statutes, by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

87. Plaintiff and Class Members were foreseeable victims of AssuranceAmerica's violations of the FTCA and state data security statutes. AssuranceAmerica knew or should have known that its failure to implement reasonable measures to protect and secure Plaintiff's and Class Members' PII would cause damage to Plaintiff and Class Members.

88. AssuranceAmerica's failure to comply with the applicable laws and regulations constitutes negligence *per se.*

89. But for AssuranceAmerica's violation of the applicable laws and regulations, Plaintiff's and Class Members' PII would not have been accessed by unauthorized parties.

90. As a result of AssuranceAmerica's failure to comply with applicable laws and regulations, Plaintiff and Class Members suffered injury, which includes but is not limited to the exposure to a heightened and imminent risk of fraud, identity theft, financial and other harm. Plaintiff and Class Members must monitor their financial accounts and credit histories more closely and frequently to guard against identity theft. Plaintiff and Class Members also have incurred, and will continue to

incur on an indefinite basis, out-of-pocket costs for obtaining credit reports, credit freezes, credit monitoring services, and other protective measures to deter or detect identity theft. The unauthorized acquisition of Plaintiff's and Class Members' PII has also diminished the value of the PII.

91. The harm to Plaintiff and the Class Members was a proximate, reasonably foreseeable result of AssuranceAmerica's breaches of the applicable laws and regulations.

92. Therefore, Plaintiff and Class Members are entitled to damages in an amount to be proven at trial.

**COUNT THREE**
**GROSS NEGLIGENCE**
**(on Behalf of Plaintiff and the Class)**

93. Plaintiff incorporates the allegations set forth in Paragraphs 1-67 as if fully set forth herein.

94. Plaintiff and Class Members entrusted AssuranceAmerica with highly-sensitive and inherently personal private data subject to confidentiality laws.

95. In requiring, obtaining and storing Plaintiff's and Class Members' PII, AssuranceAmerica owed a duty of reasonable care in safeguarding the PII.

96. AssuranceAmerica's networks, systems, protocols, policies, procedures and practices, as described above, were not adequately designed, implemented,

maintained, monitored and tested to ensure that Plaintiff's and Class Members' PII were secured from unauthorized access.

97. AssuranceAmerica's networks, systems, protocols, policies, procedures and practices, as described above, were not reasonable given the sensitivity of the Plaintiff's and Class Members' private data and the known vulnerabilities of AssuranceAmerica's systems.

98. AssuranceAmerica did not comply with state and federal laws and rules concerning the use and safekeeping of this private data.

99. Upon learning of the Data Breach, AssuranceAmerica should have immediately disclosed the Data Breach to Plaintiff and Class Members, credit reporting agencies, the Internal Revenue Service, financial institutions and all other third parties with a right to know and the ability to mitigate harm to Plaintiff and Class Members as a result of the Data Breach.

100. Despite knowing its networks, systems, protocols, policies, procedures and practices, as described above, were not adequately designed, implemented, maintained, monitored and tested to ensure that Plaintiff's and Class Members' PII was secured from unauthorized access, AssuranceAmerica ignored the inadequacies and was oblivious to the risk of unauthorized access it had created.

101. AssuranceAmerica's behavior establishes facts evidencing a reckless disregard for Plaintiff's and Class Members' rights.

102. AssuranceAmerica, therefore, was grossly negligent.

103. AssuranceAmerica's negligence also constitutes negligence per se.

104. The negligence is directly linked to injuries.

105. As a result of AssuranceAmerica's reckless disregard for Plaintiff's and Class Members' rights by failing to secure their PII, despite knowing its networks, systems, protocols, policies, procedures and practices were not adequately designed, implemented, maintained, monitored and tested, Plaintiff and Class Members suffered injury, which includes but is not limited to the exposure to a heightened, imminent risk of fraud, identity theft, financial and other harm. Plaintiff and Class Members must monitor their financial accounts and credit histories more closely and frequently to guard against identity theft. Plaintiff and Class Members also have incurred, and will continue to incur on an indefinite basis, out-of-pocket costs for obtaining credit reports, credit freezes, credit monitoring services, and other protective measures to deter or detect identity theft. The unauthorized acquisition of Plaintiff's and Class Members' PII has also diminished the value of the PII.

106. The harm to Plaintiff and the Class Members was a proximate, reasonably foreseeable result of AssuranceAmerica's breaches of the applicable laws and regulations.

107. Therefore, Plaintiff and Class Members are entitled to damages in an amount to be proven at trial.

**<u>COUNT FOUR</u>**
**BREACH OF EXPRESS CONTRACTS**
**(on Behalf of Plaintiff and the Class)**

108. Plaintiff incorporates the allegations set forth in Paragraphs 1-67 as if fully set forth herein.

109. Plaintiff and members of the Class, additionally and alternatively, allege that they entered into valid and enforceable express contracts with AssuranceAmerica.

110. Under these express contracts, AssuranceAmerica promised and was obligated to: (a) provide services to Plaintiff and Class Members; and (b) protect Plaintiff's and the Class Members' PII. In exchange, Plaintiff and members of the Class agreed to pay money for these services.

111. Both the provision of services, as well as the protection of Plaintiff's and Class Members' PII, were material aspects of these contracts.

112. AssuranceAmerica's express representations, including, but not limited to, express representations found in AssuranceAmerica's Privacy Notices,[30] formed an express contract requiring AssuranceAmerica to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' PII.

113. Alternatively, the express contracts included implied terms requiring AssuranceAmerica to implement data security adequate to safeguard and protect the

[30] *Id*.

confidentiality of Plaintiff's and Class Members' PII, including in accordance with federal, state and local laws, and industry standards.

114. Consumers value their privacy, the privacy of their dependents, and the ability to keep their PII associated with obtaining services private. To customers such as Plaintiff and Class Members, services that do not adhere to industry-standard data security protocols to protect PII are fundamentally less useful and less valuable than services that adhere to industry-standard data security. Plaintiff and Class Members would not have entered into these contracts with AssuranceAmerica without an understanding that their PII would be safeguarded and protected.

115. A meeting of the minds occurred, as Plaintiff and members of the Class provided their PII to AssuranceAmerica and paid for the provided services in exchange for, amongst other things, protection of their PII.

116. AssuranceAmerica materially breached the terms of these express contracts, including, but not limited to, the terms stated in the relevant Privacy Policy. Specifically, AssuranceAmerica did not comply with federal, state and local laws, or industry standards, or otherwise protect Plaintiff's and the Class Members' PII, as set forth above. Further, on information and belief, AssuranceAmerica has not yet provided Data Breach notifications to some affected Class Members who may already be victims of identity fraud or theft or are at imminent risk of becoming victims of identity theft or fraud associated with PII that they provided to

AssuranceAmerica. These Class Members are as yet unaware of the potential source for the compromise of their PII.

117. The Data Breach was a reasonably foreseeable consequence of AssuranceAmerica's actions in breach of these contracts.

118. As a result of AssuranceAmerica's failure to fulfill the data security protections promised in these contracts, Plaintiff and members of the Class did not receive the full benefit of the bargain, and instead received services that were of a diminished value to that described in the contracts. Plaintiff and Class Members, therefore, were damaged in an amount at least equal to the difference in the value of the secure services they paid for and the services they received.

119. Had AssuranceAmerica disclosed that its security was inadequate or that it did not adhere to industry-standard security measures, neither Plaintiff, nor Class Members, nor any reasonable person would have purchased services from AssuranceAmerica.

120. As a result of AssuranceAmerica's breach, Plaintiff and Class Members suffered actual damages resulting from the theft of their PII, as well as the loss of control of their PII, and remain in imminent risk of suffering additional damages in the future.

121. As a result of AssuranceAmerica's breach, Plaintiff and the Class Members have suffered actual damages resulting from their attempt to mitigate the

effects of the breach of contract and subsequent Data Breach, including but not limited to, taking steps to protect themselves from the loss of their PII.

122. Accordingly, Plaintiff and the other members of the Class have been injured as a result of AssuranceAmerica's breach of contracts and are entitled to damages and/or restitution in an amount to be determined at trial.

**COUNT FIVE**
**BREACH OF IMPLIED CONTRACTS**
**(on Behalf of Plaintiff and the Class)**

123. Plaintiff incorporates the allegations set forth in Paragraphs 1-67 as if fully set forth herein.

124. Plaintiff and Class Members were required to provide their PII to obtain services from AssuranceAmerica. Plaintiff and Class Members entrusted their PII to AssuranceAmerica in order to obtain its insurance services.

125. By providing their PII, and upon AssuranceAmerica's acceptance of such information, Plaintiff and Class Members on one hand, and AssuranceAmerica on the other hand, entered into implied contracts for the provision of adequate data security, separate and apart from any express contracts concerning the services provided, whereby AssuranceAmerica was obligated to take reasonable steps to secure and safeguard that information.

126. AssuranceAmerica had an implied duty of good faith to ensure that the PII of Plaintiff and Class Members in its possession was only used in accordance with their contractual obligations.

127. AssuranceAmerica was therefore required to act fairly, reasonably, and in good faith in carrying out its contractual obligations to protect the confidentiality of Plaintiff's and Class Members' PII and to comply with industry standards and state laws and regulations for the security of this information, and AssuranceAmerica expressly assented to these terms in its Privacy Policy as alleged above.

128. Under these implied contracts for data security, AssuranceAmerica was further obligated to provide Plaintiff and all Class Members, with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII.

129. Plaintiff and Class Members performed all conditions, covenants, obligations, and promises owed to AssuranceAmerica, including paying for the services provided by AssuranceAmerica and/or providing the PII required by AssuranceAmerica.

130. AssuranceAmerica breached the implied contracts by failing to take adequate measures to protect the confidentiality of Plaintiff's and Class Members' PII, resulting in the Data Breach. AssuranceAmerica unreasonably interfered with the contract benefits owed to Plaintiff and Class Members.

131. Further, on information and belief, AssuranceAmerica has not yet provided Data Breach notifications to some affected Class Members who may already be victims of identity fraud or theft, or are at imminent risk of becoming victims of identity theft or fraud, associated with the PII that they provided to AssuranceAmerica. These Class Members are unaware of the potential source for the compromise of their PII.

132. The Data Breach was a reasonably foreseeable consequence of AssuranceAmerica's actions in breach of these contracts.

133. As a result of AssuranceAmerica's conduct, Plaintiff and Class Members did not receive the full benefit of the bargain, and instead received services that were of a diminished value as compared to the secure services they paid for. Plaintiff and Class Members, therefore, were damaged in an amount at least equal to the difference in the value of the secure services they paid for and the services they received.

134. Neither Plaintiff, nor Class Members, nor any reasonable person would have provided their PII to AssuranceAmerica had AssuranceAmerica disclosed that its security was inadequate or that it did not adhere to industry-standard security measures.

135. As a result of AssuranceAmerica's breach, Plaintiff and Class Members have suffered actual damages resulting from theft of their PII, as well as the loss of

control of their PII, and remain in imminent risk of suffering additional damages in the future.

136. As a result of AssuranceAmerica's breach, Plaintiff and the Class Members have suffered actual damages resulting from their attempt to mitigate the effect of the breach of implied contract and subsequent Data Breach, including, but not limited to, taking steps to protect themselves from the loss of their PII. As a result, Plaintiff and the Class Members have suffered actual identity theft and the ability to control their PII.

137. Accordingly, Plaintiff and Class Members have been injured as a result of AssuranceAmerica's breach of implied contracts and are entitled to damages and/or restitution in an amount to be proven at trial.

## COUNT SIX
## INVASION OF PRIVACY
## (on Behalf of Plaintiff and the Class)

138. Plaintiff incorporates the allegations set forth in Paragraphs 1-67 as if fully set forth herein.

139. Plaintiff and the Class were in a position to reasonably expect privacy regarding their PII, and are entitled to the protection of this intimate information against unauthorized parties.

140. AssuranceAmerica had a duty to those it insured, including Plaintiff and Class Members, to protect their sensitive information disclosed to AssuranceAmerica for the purpose of obtaining insurance services.

141. A reasonable person would find the disclosure of their PII to cybercriminals to be used against their authorization as highly offensive.

142. Plaintiff's and the Class Members' disclosure of their PII to AssuranceAmerica was private, as it was only given on a need-to-know basis to receive insurance services from Defendant. Thus, it was a reasonable expectation that Defendant would treat their PII privately and not disclose it.

143. This Data Breach is a significant intervention into the Class Members' interest in seclusion, privacy, and solitude regarding their private information.

144. Defendant knowingly permitted the Data Breach because it knew its information security protocols were not sufficient to keep Plaintiff's and the Class's information safe. Defendant knowingly operated with sub-par data protection practices, and also knowingly failed to timely inform Plaintiff and the Class about the breach so that they could protect themselves from fraudulent activity as soon as possible.

145. Because of AssuranceAmerica's acts and failures to act, cybercriminals were able to steal and misappropriate Plaintiff's and Class Members' PII, leading to damages suffered by Plaintiff and the Class.

146. As described above, Plaintiff has already suffered substantial harm to their financial accounts, credit reports, and general sense of security as a direct result of AssuranceAmerica's actions.

147. Without being enjoined and restrained, AssuranceAmerica's wrongful actions will continue to significantly harm Plaintiff and the Class. This is because their PII is still maintained by AssuranceAmerica, which has not yet installed sufficient data security protocols to protect Plaintiff's and the Class's data.

148. Plaintiff and the Class have no adequate remedy at law for the injuries following AssuranceAmerica's continued possession of their PII. Ordering monetary damages would not be sufficient to remedy the risk caused by AssuranceAmerica's continued possession of the PII of Plaintiff and the Class.

149. In addition to injunctive relief, Plaintiff, on behalf of himself and the Class, also seek compensatory damages for AssuranceAmerica's invasion of privacy. This includes the value of the privacy interest invaded by AssuranceAmerica, future credit monitoring expenses, and prejudgment expenses.

## COUNT SEVEN
## BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING
## (on Behalf of Plaintiff and the Class)

150. Plaintiff incorporates the allegations set forth in Paragraphs 1-67 as if fully set forth herein.

151. Plaintiff and Class Members entered into and/or were the beneficiaries of contracts with Defendant, as alleged above.

152. These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual obligations—both explicit and fairly implied—and would not impair the rights of the other parties to receive their rights, benefits, and reasonable expectations under the contracts. These included the covenants that Defendant would act fairly, reasonably, and in good faith in carrying out its contractual obligations to protect the confidentiality of Plaintiff's and Class Members' PII and to comply with industry standards and federal and state laws and regulations for the security of this information.

153. Special relationships exist between Defendant and Plaintiff and Class Members. Defendant entered into special relationships with Plaintiff and Class Members, who entrusted their confidential PII to Defendant and paid for services with Defendant.

154. Defendant promised and was obligated to protect the confidentiality of Plaintiff's and Class Members' PII from disclosure to unauthorized third parties. Defendant breached the covenant of good faith and fair dealing by failing to take adequate measures to protect the confidentiality of Plaintiff's and Class Members' PII, which resulted in the Data Breach. Defendant unreasonably interfered with the

contract benefits owed to Plaintiff and Class Members by failing to implement reasonable and adequate security measures consistent with industry standards to protect and limit access to the PII of Plaintiff and the Class in Defendant's possession.

155. Plaintiff and Class Members performed all conditions, covenants, obligations, and promises owed to Defendant, including paying Defendant for services and providing the confidential PII required by the contracts.

156. As a result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and Class Members did not receive the full benefit of their bargain—services with reasonable data privacy—and instead received services that were less valuable than what they paid for and less valuable than their reasonable expectations under the contracts. Plaintiff and Class Members have suffered actual damages in an amount equal to the difference in the value between services with reasonable data privacy that Plaintiff and Class Members paid for, and the services they received without reasonable data privacy.

157. As a result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and Class Members have suffered actual damages resulting from the theft of their PII and remain at imminent risk of suffering additional damages in the future.

158. As a result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and Class Members have suffered actual damages resulting from their attempt to ameliorate the effect of the Data Breach, including, but not limited to, taking steps to protect themselves from the loss of their PII.

159. As a direct and proximate cause of Defendant's conduct, Plaintiff and Class Members suffered injury in fact and are therefore entitled to relief, including restitution, declaratory relief, and a permanent injunction enjoining Defendant from its conduct. Plaintiff also seeks reasonable attorneys' fees and costs under applicable law.

## COUNT EIGHT
## UNJUST ENRICHMENT
## (on Behalf of Plaintiff and the Class)
## (ALTERNATIVE TO BREACH OF CONTRACT CLAIM)

160. Plaintiff incorporates the allegations set forth in Paragraphs 1-67 as if fully set forth herein.

161. Plaintiff and Class Members conferred a monetary benefit on Defendant in the form of monetary payments—directly or indirectly—for services received.

162. Defendant collected, maintained, and stored the PII of Plaintiff and Class Members and, as such, Defendant had knowledge of the monetary benefits conferred by Plaintiff and Class Members.

163. The money that Plaintiff and Class Members paid to Defendant should have been used to pay, at least in part, for the administrative costs and implementation of data management and security. Defendant failed to implement—or adequately implement—practices, procedures, and programs to secure sensitive PII, as evidenced by the Data Breach.

164. As a result of Defendant's failure to implement security practices, procedures, and programs to secure sensitive PII, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in the value between services with reasonable data privacy that Plaintiff and Class Members paid for, and the services they received without reasonable data privacy.

165. Under principles of equity and good conscience, Defendant should not be permitted to retain money belonging to Plaintiff and Class Members because Defendant failed to implement the data management and security measures that are mandated by industry standards and that Plaintiff and Class Members paid for.

166. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds received by Defendant. A constructive trust should be imposed upon all unlawful and inequitable sums received by Defendant traceable to Plaintiff and the Class.

**COUNT NINE**
**DECLARATORY JUDGMENT**
**(on Behalf of Plaintiff and the Class)**

167. Plaintiff incorporates the allegations set forth in Paragraphs 1-67 as if fully set forth herein.

168. Plaintiff and the Class have stated claims against Defendant based on negligence, negligence per se, gross negligence and negligent misrepresentation, and violations of various state and federal statutes.

169. Defendant failed to fulfill its obligations to provide adequate and reasonable security measures for the PII of Plaintiff and the Class, as evidenced by the Data Breach.

170. As a result of the Data Breach, Defendant's system is more vulnerable to unauthorized access and requires more stringent measures to be taken to safeguard the PII of Plaintiff and the Class going forward.

171. An actual controversy has arisen in the wake of the Data Breach regarding Defendant's current obligations to provide reasonable data security measures to protect the PII of Plaintiff and the Class. Defendant maintains that its security measures were—and still are— reasonably adequate and denies that it previously had or has any obligation to implement better safeguards to protect the PII of Plaintiff and the Class.

172. Plaintiff seeks a declaration that Defendant must implement specific additional, prudent industry security practices to provide reasonable protection and security to the PII of Plaintiff and the Class. Specifically, Plaintiff and the Class seek a declaration that Defendant's existing security measures do not comply with its obligations, and that Defendant must implement and maintain reasonable security measures on behalf of Plaintiff and the Class to comply with its data security obligations.

## VII. PRAYER FOR RELIEF

Plaintiff, on behalf of himself and on behalf of the proposed Class and Subclasses, request that the Court:

a. Certify this case as a class action, appoint Plaintiff as class representative, and appoint Plaintiff's Counsel as Class Counsel for Plaintiff to represent the Class;

b. Find that AssuranceAmerica breached its duty to safeguard and protect the PII of Plaintiff and Class Members that was compromised in the Data Breach;

c. Award Plaintiff and Class Members appropriate relief, including actual and statutory damages, restitution and disgorgement;

d. Award equitable, injunctive and declaratory relief as may be appropriate;

e. Award all costs, including experts' fees and attorneys' fees, and the costs of prosecuting this action;

f. Award pre-judgment and post-judgment interest as prescribed by law; and

g. Grant additional legal or equitable relief as this Court may find just and proper.

## VIII. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: July 28, 2026

Respectfully submitted,

*/s/ Casondra Turner*
Casondra Turner (GA S.B. #418426)
MILBERG, PLLC
260 Peachtree Street NW, Suite 2200
Atlanta, GA 30303
Tel: (771) 772-3086
Email: cturner@milberg.com

*/s/ Thomas E. Loeser*
Thomas E. Loeser (*pro hac vice forthcoming*)
Kelly A. Aristides (*pro hac vice forthcoming*)
**COTCHETT, PITRE & McCARTHY LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Tel: (206) 802-1272
tloeser@cpmlegal.com
karistides@cpmlegal.com

*Counsel for Plaintiff and the Proposed Class*